People v Caden N. (2020 NY Slip Op 05979)





People v Caden N.


2020 NY Slip Op 05979


Decided on October 22, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: October 22, 2020

111696

[*1]The People of the State of New York, Respondent,
v
Caden N., Appellant.

Calendar Date: September 16, 2020

Before: Garry, P.J., Egan Jr., Lynch, Mulvey and Reynolds Fitzgerald, JJ.


Schlather, Stumbar, Parks & Salk, LLP, Ithaca (Raymond M. Schlather of counsel), for appellant.
Weeden A. Wetmore, District Attorney, Elmira (William D. Vandelinder of counsel), for respondent.



Lynch, J.
Appeal from a judgment of the County Court of Chemung County (Rich Jr., J.), rendered August 16, 2019, which sentenced defendant upon his adjudication as a youthful offender.
In July 2018, defendant, then 18 years old, was driving his vehicle on Westinghouse Road in the Village of Horseheads, Chemung County with three passengers. As he was turning left from the southbound lane of Westinghouse Road onto Westlake Street, he collided with a motorcycle approaching in the northbound lane of Westinghouse Road, resulting in the deaths of the motorcycle's driver and passenger (hereinafter collectively referred to as the victims). A blood test taken a little less than three hours after the accident revealed the presence of THC in defendant's blood. He was thereafter charged by indictment with vehicular manslaughter in the first degree, two counts of vehicular manslaughter in the second degree and driving while ability impaired by drugs.[FN1]
Prior to trial, defendant requested a hearing under Frye v United States (293 F 1013 [DC Cir 1923]) to determine the admissibility of certain evidence pertaining to his alleged impairment at the time of the accident. County Court granted the request and, following the hearing, permitted a police sergeant and a state trooper to testify about their observations of defendant after the accident and his performance on certain field sobriety tests (hereinafter FSTs). However, the court precluded them from giving their "opinion regarding . . . the level of defendant's impairment" due to their failure to perform the full 12-step Drug Recognition Evaluation protocol. The court also limited testimony from any witness about "[a] correlation between blood levels of THC which may have been taken at the [emergency room] and [defendant's] impairment at the time of the crash."
Following a bench trial, County Court found defendant guilty of vehicular manslaughter in the first degree, adjudicated him a youthful offender, sentenced him to a prison term of 1 to 3 years and ordered him to pay restitution.[FN2] Defendant appeals.
Defendant contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence because the People failed to prove that he operated his vehicle while impaired by marihuana and caused the victims' deaths as a result. We disagree. When assessing the legal sufficiency of the evidence, we "view the evidence in the light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the [factfinder] on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Rudge, 185 AD3d 1214, 1215 [2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 1070 [2020]; see People v Ramos, 19 NY3d 133, 136 [2012]). When undertaking a weight of the evidence analysis, we must "view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, [then] weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Henry, 173 AD3d 1470, 1473 [2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 932 [2019]).
As relevant here, "[a] person is guilty of vehicular manslaughter in the first degree when he or she commits the crime of vehicular manslaughter in the second degree . . . [and] causes the death of more than one other person" (Penal Law § 125.13 [4]). A person is guilty of vehicular manslaughter in the second degree when, in pertinent part, "he or she causes the death of another person, and . . . operates a motor vehicle in violation of [Vehicle and Traffic Law § 1192 (4)], and as a result of . . . impairment by the use of a drug . . . operates such motor vehicle . . . in a manner that causes the death of such other person" (Penal Law § 125.12 [1]). Vehicle and Traffic Law § 1192 (4) provides that "[n]o person shall operate a motor vehicle while the person's ability to [do so] is impaired by the use of a drug."
The term "impairment" as used in Penal Law § 125.12 (1) is not statutorily defined. The Court of Appeals has defined that term in the limited context of the prohibition against driving while one's ability to do so is impaired by alcohol (see Vehicle and Traffic Law § 1192 [1]). In that situation, the question of impairment focuses on "whether, by voluntarily consuming alcohol, [the] defendant has actually impaired, to any extent, the physical and mental abilities which he [or she] is expected to possess in order to operate a vehicle as a reasonable and prudent driver" (People v Cruz, 48 NY2d 419, 427 [1979] [emphasis added], appeal dismissed 446 US 901 [1980]; accord People v Keener, 152 AD3d 1075, 1075 [2017]). However, as noted by the Court of Appeals, driving while intoxicated by alcohol is a more serious offense (a misdemeanor) than driving while impaired by alcohol (a traffic infraction) and, therefore, requires a showing of "a greater degree of impairment," focusing on whether "the driver has voluntarily consumed alcohol to the extent that he [or she] is incapable of employing the physical and mental abilities which he [or she] is expected to possess in order to operate a vehicle as a reasonable and prudent driver" (People v Cruz, 48 NY2d at 428 [emphasis added]; see Matter of Johnston, 75 NY2d 403, 408-409 [1990]). Although the parties both rely on the Court of Appeals' definition of "impairment by alcohol" as set forth in Cruz to supply the relevant definition of "impairment by the use of a drug" as used in Penal Law § 125.12, we conclude that this definition is misplaced in the context of assessing whether a person has committed the crime of vehicular manslaughter in the second degree. The focus of these provisions is on whether a driver's ability to operate a motor vehicle has been compromised by the consumption of alcohol or drugs and to what extent. In effect, the greater a driver's ability to function has been compromised the greater the penalty imposed (see People v Litto, 8 NY3d 692, 705 [2007]). For this reason, "the scheme of [Vehicle and Traffic Law §] 1192 provides for different levels or kinds of proof to establish violations of the statute" (id.).
Notably, under Penal Law § 125.12 (1), one who operates a motor vehicle and causes the death of another while impaired by alcohol is not subject to a conviction for vehicular manslaughter in the second degree, whereas one who causes such death while intoxicated by alcohol or impaired by a drug (or a combination of alcohol and drugs) falls within the statute's reach (see Penal Law §§ 125.13, 125.12 [1]). This statutory scheme imposes equal sanctions upon motorists who cause death while intoxicated by alcohol or while impaired by a drug (see People v Litto, 8 NY3d at 702). Such a distinction between impairment by alcohol and impairment by a drug (or a combination of both) can only be deemed consistent with the legislative scheme if the same standard is applied to each misdemeanor category included in the vehicular manslaughter statute. Accordingly, in our view, the degree of impairment necessary to convict a motorist of vehicular manslaughter in the second degree based upon a death that was caused while such motorist was under the influence of one of the drugs enumerated in Public Health Law § 3306 (which includes marihuana) is the same degree of impairment as would be necessary to sustain a conviction of driving while intoxicated by alcohol — namely, the People must prove that such motorist was "incapable of employing the physical and mental abilities which he [or she was] expected to possess in order to operate a vehicle as a reasonable and prudent driver" (People v Cruz, 48 NY2d at 428 [emphasis added]). To the extent that this Court's decision in People v Rossi (163 AD2d 660, 662 [1990], lv denied 76 NY2d 943 [1990]) can be read as holding that a conviction of vehicular manslaughter in second degree based upon a violation of Vehicle and Traffic Law § 1192 (4) only requires proof that the motorist was impaired "to any extent," it should no longer be followed.
With respect to causation, the People were required to prove that defendant "set in motion the events that led to the victims' deaths" and "was a sufficiently direct cause of the ensuing deaths" (People v Ballenger, 106 AD3d 1375, 1377 [2013] [internal quotation marks, brackets and citations omitted], lv denied 22 NY3d 995 [2013]). "[A] defendant's conduct constitutes a sufficiently direct cause of death when the People prove (1) that [the] defendant's actions were an actual contributory cause of the death, in the sense that they forged a link in the chain of causes which actually brought about the death; and (2) that the fatal result was reasonably foreseeable" (People v Li, 34 NY3d 357, 369 [2019] [internal quotation marks, brackets and citation omitted]; see People v DaCosta, 6 NY3d 181, 184 [2006]).
At trial, a friend of defendant (hereinafter passenger 1) testified that defendant picked him up in his vehicle from the house of a mutual friend (hereinafter passenger 4) at approximately 4:00 p.m. on July 10, 2018 to take him to work. Two other individuals (hereinafter passengers 2 and 3) were present in defendant's vehicle and passenger 4 also got in. According to passenger 1, the group emptied tobacco from three small cigars and filled them each with marihuana. Passenger 1 explained that defendant then drove to the vicinity of Harris Hill in the City of Elmira, Chemung County, where the group — including defendant — smoked two of the marihuana cigarettes while defendant was driving. Passenger 1 testified that defendant took some turns over Harris Hill that were "a little quick," prompting passenger 1 to fasten his seatbelt. Defendant then dropped passenger 1 off at work and went with the three other passengers to the mall.
The other passengers corroborated passenger 1's testimony that the group smoked marihuana before dropping passenger 1 off at work. Passenger 3 also testified that defendant drove quickly over Harris Hill, describing his driving as "reckless[]" but noting that Harris Hill has a "steep slope" and he was generally not concerned. At approximately 4:30 p.m., after passenger 1 had been dropped off at work, the rest of the group went to a mall, where more marihuana was consumed in the parking lot. They then decided to go to a tattoo shop and proceeded through the Village of Horseheads. According to passenger 3, when defendant was attempting to turn onto Westinghouse Road from Watkins Glen Road, he failed to yield the right-of-way to a car that was also attempting to turn onto Westinghouse Road from the opposite direction and that had gotten to the intersection first. Although passenger 3 was not concerned, he explained that defendant "went in front" of the car and thought "that was a little close." Defendant then proceeded southbound on Westinghouse Road within the speed limit and activated his left turn signal when he came upon Westlake Street. When he was in the process of turning left onto Westlake Street, passenger 2, who was in the front passenger seat, yelled for him to stop because she saw a motorcycle coming in the northbound traffic lane on Westinghouse Road, estimating that it was 50 yards away at the time. To passenger 2's knowledge, there were no cars in front of defendant's vehicle at that time. The motorcycle ended up striking the front of defendant's vehicle — to the right of its license plate — in the northbound lane of Westinghouse Road, resulting in the victims' deaths. The collision occurred at 5:48 p.m., after which defendant told police officers that he did not see the motorcycle before impact.
As to the manner in which the accident occurred, the People elicited testimony from non-passenger witnesses Sidney Smith and Danielle Folk, who were both driving in the southbound lane of Westinghouse Road a few cars behind defendant's vehicle. Smith recalled seeing defendant's vehicle make an "abrupt turn" onto Westlake Street seconds before the accident and stated that she was able to see the motorcycle immediately before impact "not very far" from defendant's vehicle. Folk similarly testified that defendant made a "left turn" and "cut[] the motorcycle off almost immediately." Folk, who was a couple of cars behind defendant at the time, stated that she was able to see the motorcycle "only an instant" before the accident. The People also presented evidence that the portion of Westinghouse Road that intersects with Westlake Street is relatively straight and flat, and that it was a sunny day when the accident occurred.
David Ruhmel, a police officer, testified that he responded to the accident, smelled marihuana emanating from defendant's vehicle and found a "small plastic baggie" of marihuana on the pavement near the car. However, he did not smell marihuana on defendant's person and observed him to be coherent and steady on his feet. Sean Murray, a police sergeant, then arrived on the scene and accompanied defendant to the hospital, where he performed a series of FSTs. Although Murray conceded that defendant performed some of the FSTs in a satisfactory manner, he emphasized that defendant was unable to hold his eyes in a crossed position during a convergence test and described "a noticeable" fluttering under defendant's eyelids and a tremor in his right leg during a modified Romberg test. State trooper Brandon Salyerds, who watched Murray perform the FSTs, observed that defendant had bloodshot and watery eyes, but acknowledged such condition could have been caused by crying. Moreover, a physician who examined defendant at the hospital found his eyes to converge and dilate appropriately.
A blood test taken a little less than three hours after the accident revealed 2.2 ng/ml of delta-9 THC and 33 ng/ml of delta-9 carboxy THC in defendant's blood. The People's forensic toxicologist, Daniel Isenschmid, testified that delta-9 THC concentrations in the blood are highest at the time of smoking and generally taper off to very low levels a couple of hours later. Isenschmid explained that, although delta-9 carboxy THC is an inactive metabolite that does not have psychoactive effects, it can be used as a marker of prior cannabis use because it forms more slowly and then "remains elevated for a longer period of time after the delta-9 THC goes down." According to Isenschmid, the level of carboxy THC in defendant's blood was a "relatively high concentration," signifying that an even higher concentration of delta-9 THC had been present in defendant's blood at some earlier point in time. That said, Isenschmid noted that, unlike with alcohol, it was impossible to extrapolate the concentration of THC backwards to an earlier time. Elizabeth Spratt, another forensic toxicologist who testified for the People, explained that marihuana impacts a person's psychomotor performance and reaction time. Spratt noted that marihuana consumption can produce certain physical manifestations, such as bloodshot and watery eyes and a lack of convergence. Spratt opined that the characteristics that Murray and Salyerds observed when defendant was performing the FSTs, coupled with the circumstances of the accident and his "positive THC level in the blood hours after the incident" indicated that "his psychomotor performance was impaired" at the time of the accident. However, a board-certified pathologist who testified for defendant stated that it was impossible to determine whether defendant was impaired at the time of the accident because there were "too many unknown variables" and no consensus in the scientific community as to when the peak effects of marihuana occur.
The People also presented evidence from an accident reconstructionist, who opined that the vehicle's point of rest in the oncoming traffic lane indicated that defendant had taken a short left-hand turn while prematurely cutting across the center line. Moreover, the information collected from the event data recorder in defendant's vehicle showed that, five seconds before impact, defendant was traveling in a straight line within the speed limit. From five seconds to 1½ seconds before impact defendant was "casually slowing down." By 1½ seconds before impact, defendant's turning input had increased to five degrees, which the accident reconstructionist noted "was pretty insignificant . . . [and] [p]robably wouldn't even have changed his [lane]." However, by one second prior to impact, defendant's steering input increased to 55 degrees. The accident reconstructionist explained that it normally takes a person 1½ seconds to perceive a danger and timely react, testifying that defendant's turning motion "didn't allow the [motorcycle driver] enough time to see, perceive and react." Based upon the evidence, the reconstructionist concluded that "[t]he primary cause of the crash was [defendant's] failure to yield [the] right-of-way" and his "left turn directly into the path of the motorcycle." There was conflicting evidence as to the motorcycle's preimpact speed, with the People's accident reconstructionist estimating that the motorcycle was traveling between 25 and 30.7 miles per hour at impact and defendant's reconstructionist approximating a speed of 63.22 miles per hour. Defendant's accident reconstructionist opined that, had the motorcycle been traveling within the speed limit, defendant would have completed the turn without incident.
Viewing the foregoing evidence in the light most favorable to the People, and utilizing the "impairment" standard defined above, we conclude that there is a valid line of reasoning and permissible inferences that could lead a rational factfinder to conclude that defendant operated his vehicle while impaired by marihuana and, because of such impairment, did so in a manner that caused the victims' deaths (see People v Uribe, 109 AD3d 844, 844 [2013], lv denied 23 NY3d 969 [2014]; People v Vercruysse, 221 AD2d 999, 999 [1995]). As to the weight of the evidence, a different verdict would not have been unreasonable given the testimony that defendant did not appear outwardly impaired when police officers reported to the scene of the accident. Nevertheless, the extensive testimony regarding defendant's marihuana consumption less than two hours before the accident, coupled with the manner in which he was driving prior thereto and his failure to notice the motorcycle in the oncoming traffic lane despite an unobstructed view and the ability of at least two other people to see it immediately prior to the accident, supported County Court's determination that defendant was "incapable of employing the physical and mental abilities which he [wa]s expected to possess in order to operate a vehicle as a reasonable and prudent driver" (People v Cruz, 48 NY2d at 428).
With respect to causation, the People demonstrated that defendant set in motion the events that led to the victims' death by abruptly turning left in front of the approaching motorcycle on a 40 mile-per-hour roadway. It was foreseeable that the victims could die as a result of defendant's conduct (see generally People v Li, 34 NY3d at 369-370). The conflicting expert opinions as to the motorcycle's preimpact speed presented credibility issues for County Court to resolve (see People v Kouao, 177 AD3d 1335, 1335 [2019], lv denied 34 NY3d 1160 [2020]). In any event, defendant's conduct need not have been the sole cause of death for criminal liability to attach (see People v DaCosta, 6 NY3d at 184). "Even an intervening, independent agency will not exonerate [a] defendant unless the death is solely attributable to the secondary agency, and not at all induced by the primary one" (Matter of Anthony M., 63 NY2d 270, 280 [1984] [internal quotation marks and citations omitted]; accord People v Li, 34 NY3d at 370). Although passenger 2 estimated that the motorcycle was 50 yards away when defendant initiated his turn, she admitted to having consumed marihuana before the accident. By contrast, Folk and Smith both indicated that defendant turned within close proximity to the motorcycle, with Folk stating that defendant "cut[] the motorcycle off almost immediately." The evidence from the event data recorder substantiates that contention. Given such evidence, a rational factfinder could discredit passenger 2's testimony and conclude that defendant took a left turn far too close to the motorcycle. When deferring to County Court's credibility determinations and viewing the evidence in a neutral light (see People v Gill, 168 AD3d 1140, 1141 [2019]), we find that the People proved beyond a reasonable doubt that the crash was not solely attributable to the motorcyclist's speed and that defendant's failure to perceive and yield the right-of-way to the oncoming motorcycle under the described circumstances was a "sufficiently direct cause of the ensuing death[s]" (People v Ballenger, 106 AD3d at 1377 [internal quotation marks and citations omitted]; see People v Peryea, 68 AD3d 1144, 1147-1148 [2009], lv denied 14 NY3d 804 [2010]; compare People v Ryan, 161 AD3d 893, 897 [2018]). Accordingly, the verdict is not against the weight of the evidence.
Although not challenging County Court's Frye ruling, defendant next contends that the court violated its Frye ruling and abused its discretion in admitting certain opinion testimony from Spratt on the issue of defendant's alleged impairment. Generally, "trial courts possess broad discretion to make evidentiary rulings" precluding or admitting evidence (People v Hemphill, 35 NY3d 1035, 1036 [2020]; see People v Aska, 91 NY2d 979, 981 [1998]), and, "absent an abuse of discretion, those rulings should not be disturbed on appeal" (People v Collins, 126 AD3d 1132, 1133 [2015] [internal quotation marks and citations omitted], lv denied 25 NY3d 1161 [2015]). Expert opinion testimony is proper "when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror" (People v Rivers, 18 NY3d 222, 228 [2011] [internal quotation marks and citations omitted]).
Defendant contends that County Court erred by allowing Spratt to utilize his performance on the FSTs as a component of her opinion that defendant was impaired at the time of the accident when both Murray and Salyerds were precluded from opining as to his impairment due to their failure to administer the full Drug Recognition Evaluation protocol. Spratt, however, was a board-certified forensic toxicologist who possessed specialized knowledge about the manner in which marihuana affects psychomotor capabilities and was qualified to give an opinion on the matter (see People v MacDonald, 227 AD2d 672, 674-675 [1996], affd 89 NY2d 908 [1996]; see generally People v Lamont, 21 AD3d 1129, 1132 [2005], lv denied 6 NY3d 835 [2006]). In any event, Spratt's opinion regarding defendant's impairment was not solely based on the FST results, and she confirmed that her opinion regarding defendant's impairment would remain the same even if no FSTs had been performed. As such, we perceive neither inconsistency nor error in the court's admission of such testimony. Moreover, contrary to defendant's contention, Spratt did not base her opinion that he was impaired at the time of the accident on the specific level of THC found in his blood and expressly acknowledged that "you can't back extrapolate . . . with marihuana." Rather, Spratt referenced the active THC found in defendant's blood as background information relevant to her assessment, based upon a constellation of factors, that defendant was impaired by the marihuana that he had smoked shortly before the accident. Her opinion was informed by a variety of factors, including the timing of the accident in relation to when the peak effects of marihuana typically occur, the circumstances of the accident, defendant's "outward signs" of impairment and the fact that active THC was found in his blood thereafter. As Spratt was qualified to render such an opinion and her testimony was within the permissible bounds of County Court's Frye ruling, County Court did not abuse its discretion in admitting her testimony (see People v Nicholson, 26 NY3d 813, 829 [2016]).
Defendant further contends that the presumption set forth in Penal Law §§ 125.13 and 125.12 is unconstitutional as applied in cases of marihuana impairment because it shifts the burden of proof on the element of causation and is unconstitutionally vague. Penal Law § 125.13 provides that, "[i]f it is established that the person operating such motor vehicle caused such death or deaths while unlawfully intoxicated or impaired by the use of alcohol or a drug[,] . . . then there shall be a rebuttable presumption that, as a result of such intoxication or impairment[,] . . . such person operated the motor vehicle in a manner that caused such death or deaths." In People v Stickler (97 AD3d 854 [2012], lv denied 20 NY3d 989 [2012]), this Court concluded that the presumption set forth in Penal Law § 125.12 — which is substantially the same as the one set forth in Penal Law § 125.13 — does not shift the burden of proof on the element of causation, explaining the presumption is permissive and arises only if the People first prove, beyond a reasonable doubt, that the person operating a motor vehicle caused the victim's death while unlawfully intoxicated by alcohol or impaired by a drug. This Court also concluded that the presumption does not render Penal Law § 125.12 unconstitutionally vague because "it contains sufficient standards to afford a reasonable degree of certainty so that a person of ordinary intelligence is not forced to guess at its meaning, and to safeguard against arbitrary enforcement" (People v Stickler, 97 AD3d at 856 [internal quotation marks and citations omitted]). Although Stickler was decided in the context of an accident that occurred when the defendant was intoxicated by alcohol, we perceive no reason to depart from its holding in the case of impairment by marihuana. Moreover, based on the evidence presented at trial, there was a "rational way the trier [of fact] could make the connection permitted by the inference" (Matter of Raquel M., 99 NY2d 92, 95-96 [2002] [internal quotation marks and citation omitted]; see People v Leyva, 38 NY2d 160, 165 [1975]).[FN3] Therefore, defendant's constitutional challenges fail.
Furthermore, recognizing that this was a bench trial, County Court did not err in denying defendant's request to deviate from the standard set forth in the Criminal Jury Instructions (hereinafter CJI) to reflect that the presumption applied only if the court found defendant to be the sole proximate cause of the victims' deaths. As previously explained, defendant's contention in that respect ignores the well-settled premise that criminal liability "will attach even if the defendant's conduct is not the sole cause of death" (People v DaCosta, 6 NY3d at 184; see People v Li, 34 NY3d at 369). Indeed, "if a driver's operation of a vehicle cannot be deemed a proximate cause of the subject accident, then the rebuttable presumption would not arise" (People v Mojica, 62 AD3d 100, 110 [2009] [emphasis added], lv denied 12 NY3d 856 [2009]).[FN4] As such, County Court did not err in declining to revise the CJI charge on vehicular manslaughter in the first degree with respect to the presumption and appropriately adhered to the expanded CJI charge on causation.
Defendant also contends that County Court abused its discretion in excluding certain testimony about the motorcycle driver's positive blood test for THC. At the outset, we note that the trial evidence included an exhibit of the motorcycle driver's postmortem toxicology report, which showed a positive THC level of 0.73 ng/ml. County Court, therefore, had evidence before it regarding the fact that THC was found in the motorcycle driver's blood. It merely precluded additional trial testimony on the matter. To the extent that such testimony may have been relevant to the issue of the motorcycle driver's impairment at the time of the collision, such impairment, even if it could be established, would not have constituted a superseding cause sufficient to absolve defendant of criminal liability under these circumstances, given the proof that the manner in which he turned in front of the motorcycle would not have given even a nonimpaired person sufficient time to react (see People v Peryea, 68 AD3d at 1147). Therefore, we cannot conclude that County Court committed reversible error in excluding such testimony (compare People v Lazartes, 23 AD3d 400, 405-406 [2005]).
Finally, we agree with defendant that County Court erred in failing to give an adverse inference charge with respect to the People's failure to preserve certain paint transfers on the motorcycle's crash bar bolt that were material to the defense expert's assessment of the motorcycle's preimpact speed. Nevertheless, County Court was made aware of the People's alleged failure to preserve this evidence and, given the strength of the People's proof, we conclude that "there is no significant probability" that defendant would have been acquitted but for County Court's failure to provide an adverse inference charge (People v Viruet, 29 NY3d 527, 533 [2017] [internal quotation marks and citations omitted]; see People v Strife, 167 AD3d 1095, 1098 [2018]). In our view, the error was harmless.
Defendant's remaining contentions, to the extent not specifically addressed herein, have been considered and found lacking in merit.
Garry, P.J., Egan Jr., Mulvey and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is affirmed, and matter remitted to the County Court of Chemung County for further proceedings pursuant to CPL 460.50 (5).



Footnotes

Footnote 1: Although count 3 of the indictment charged the crime of vehicular manslaughter in the first degree, it provided a citation to the Penal Law section for vehicular manslaughter in the second degree (see Penal Law § 125.12 [1]).

Footnote 2: County Court did not reach a verdict on the remaining counts insofar as they were lesser included offenses of the first count.

Footnote 3: It is noted that County Court did not specifically state whether it would apply the presumption in this case, stating only that it saw no reason why it could not consider it and that it was "not as a matter of law ruling the presumption out."

Footnote 4: This Court's pronouncement in People v Stickler (97 AD3d at 856) that the rebuttable presumption does not arise if "a driver's operation of a vehicle cannot be deemed the cause of the subject accident" is a misstatement of law and should not be followed (emphasis added; internal brackets omitted).